Receipt number AUSFCC-9808166

## THE UNITED STATES COURT OF FEDERAL CLAIMS

JANE DOE,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

Case No. _____24-1349 C_____

## PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT

### INTRODUCTION

This case involves one Veteran's effort to pursue her rights under the military's disability evaluation system. As one Judge of this Court recently remarked:

> Shakespeare was undoubtedly correct that "brevity is the soul of wit," and although we will attempt to be as brief as possible, there is nothing amusing about this system's complexity. Indeed, describing the [disability evaluation system] as byzantine is an understatement that may be unkind even to that ancient empire.

*Keltner v. United States*, 165 Fed. Cl. 484, 488 (2023) (footnote omitted). Plaintiff, Jane Doe ("Plaintiff" or "Ms. Doe") brings this action for disability retirement or disability separation pay and benefits and for correction of military records that the United States Department of the Air Force ("Air Force") unlawfully denied her.

### JURISDICTION

1.      This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. §§ 1491(a)(1) and 1491(a)(2). The statutory basis for invoking this Court's jurisdiction is 10 U.S.C. § 1201, which provides for the payment of disability retirement compensation, and 10 U.S.C. § 1203, which provides for the payment of disability separation pay. Sections 1201 and

1203 are both money-mandating sources of substantive law for purposes of the jurisdiction of this Court.

2.    In accordance with 28 U.S.C. § 2501, this action is timely brought within six (6) years from December 8, 2023 which is the date that the Air Force Board for the Correction of Military Records – the first and only statutorily authorized board to rule on Ms. Doe's claims – transmitted its decision denying Ms. Doe's claims for disability retirement or disability separation pay and her claims for correction of her military records.

## PARTIES

3.    Ms. Doe is an adult female, African-American citizen of the United States residing in the State of Maryland who served honorably in the Air Force from August 24, 2010 to January 14, 2016.

4.    The Defendant is the United States of America, acting by and through the Department of the Air Force which is an agency of the federal government.  References are made herein interchangeably to "Defendant" or the "Air Force."

## STATEMENT OF FACTS

### I.    INTRODUCTION

5.    Ms. Doe enlisted in the Air Force at age nineteen (19) to serve her country, provide for her family and obtain the financial means to realize her dream of becoming a medical doctor. Ms. Doe served on active duty from August 24, 2010 until January 14, 2016 when, at the rank of Staff Sergeant (E-5), she was separated with an Honorable Discharge, eight (8) months before the end of her six (6) year enlistment.  Ms. Doe successfully completed basic military training and training in Honor Guard, Airman Leadership School and Health Care Optimization/Operational Medicine.  Ms. Doe's military occupational specialties were Honor Guard (8G000) and Aerospace Medical Service (4N071).  As a family health clinic technician, Ms. Doe received awards for being

the top Airman in the facility and was placed in charge of training thirty (30) incoming and existing personnel on a new protocol for the clinic. Ms. Doe received the AF Good Conduct Medal, AF Longevity Service Ribbon, USAF NCO PME Graduate Ribbon, AF Training Ribbon, Meritorious Unit Award, AF Outstanding Unit Award, National Defense Service Medal and Global War on Terrorism Service Medal.

6.     Following her separation, Ms. Doe completed a four (4) year course of study at American University in Washington, D.C. and graduated with a bachelor's degree in June 2020. Pursuing her aspirations to ultimately become a medical doctor, Ms. Doe obtained a fellowship with the Centers for Disease Control and Prevention ("CDC") that began in Tallahassee, Florida in October 2020. During her time at the CDC, Ms. Doe completed a two (2) year course of study at the George Washington University in Washington, D.C., and graduated with a master's degree in May 2023. Ms. Doe currently works in the field of environmental health and aspires to specialize in this area as a medical doctor.

## II.    MS. DOE IS A RAPE SURVIVOR AND A VICTIM OF MILITARY SEXUAL TRAUMA

7.     Ms. Doe's accomplishments at this stage of her life (33 years) – a foreign exchange scholarship, Veteran with Honorable service as a Staff Sergeant, college graduate, selected for a competitive fellowship with the CDC and obtaining a master's degree – are admirable. But they are all the more impressive because she is a rape survivor and a victim (and survivor) of military sexual trauma (MST). For Ms. Doe the emotional and psychological burden of recounting her violent sexual experiences has caused further traumatization, not unlike the trauma that other survivors of rape, intimate partner violence, and/or sexual assault experience in our legal system.[1]

---

[1] *See* Katiral, Negar. *Retraumatized in Court*, 62 ARIZ. L. REV. 81 (2020) at 83-85.

Throughout this "administrative" process, which should focus on the Air Force's wrongful separation actions and the error-filled evaluations submitted by the Air Force, Ms. Doe has had to repeatedly recount intimate details of some of the worst moments of her life.

### A.      The Sexual Traumas that Ms. Doe Has Endured

8.      In high school, at age seventeen (17), Ms. Doe was raped by a basketball player from Cameroon when she was in Thailand on a foreign student exchange scholarship.  While walking her home one night after drinking at a bar where she became intoxicated, the basketball player pushed Ms. Doe into an alleyway and raped her.  The experience devastated Ms. Doe.  She survived through dissociation – by feeling that she was watching herself from above during the rape.  Ms. Doe tried to report the incident to her host family and teachers, but the language barrier proved too difficult.  She also felt ashamed and believed that she would have been looked down upon in the Thai community.  The rape caused Ms. Doe to have uncontrollable flashbacks, night sweats and insomnia and brought on depression and anxiety.  Like many rape survivors, Ms. Doe has found it very difficult to talk about this trauma.  She was only able to talk about it with her mother a year after the incident when the flashbacks had sufficiently subsided.  Ms. Doe did not have the resources to obtain mental health assistance to deal with the trauma.  She coped with it as best she could, by burying the memories and relying on her religious faith and prayer.

9.      Ms. Doe had to relive the trauma of the Thailand rape experience during her Air Force service when she was stationed at Tyndall Air Force Base in Florida.  In the early morning of January 1, 2013, Ms. Doe was attacked in the parking lot of a night club in Destin, Florida, by her then-boyfriend who was also an active-duty Airman.  The assailant struck Ms. Doe, pushed her against a building wall, and then threw her to the ground on her back, dragging her across the

gravel parking lot. With the help of a fellow female Airman, who witnessed the incident, Ms. Doe

disengaged from the assault. However, later that night, Ms. Doe awoke to find the assailant in her

hotel room pinning her down in her bed. Ms. Doe was terrified that the assailant was going to kill

her. The physical assault, recorded in her medical records as "Adult Physical Abuse," caused pain

and swelling in Ms. Doe's knees and ankles and pain in both wrists and left shoulder. Ms. Doe

obtained medical treatment for all of these conditions. The assault also brought back all of the

horrific memories of the rape in Thailand and produced anxiety attacks and depression.

10.     Ms. Doe reported the violent assault to her Air Force command. This led to a non-

contact order against the male Airman assailant, but it did little good. The assailant lived in the

same dormitory at Tyndall and continued to see Ms. Doe and harass and threaten her with violence

for having reported him. These threats forced Ms. Doe to stay in her dorm room unless she had to

go to the dining facility to eat. The assailant also harassed the female Airman who witnessed the

incident. Ms. Doe filed a report of the assault with the Okaloosa County, Florida, Sheriff's Office,

and her account was corroborated by a female Airman. However, the police declined action

against the assailant, apparently because there were "no independent witnesses" to the assault. The

assailant ultimately was separated from the Air Force approximately five (5) months after the

assault.

**B.     Ms. Doe's Sexual Traumas Result in Diagnoses of PTSD and Positive Screens for Military Sexual Trauma**

11.     The American Psychiatric Association has described and explained[2] Post-

Traumatic Stress Disorder ("PTSD") as follows:

> Posttraumatic stress disorder (PTSD) is a psychiatric disorder that may occur in
> people who have experienced or witnessed a traumatic event, series of events or set
> of circumstances. An individual may experience this as emotionally or physically

---

[2] https://www.psychiatry.org/patients-families/ptsd/what-is-ptsd (last visited 02/04/24).

harmful or life-threatening and may affect mental, physical, social, and/or spiritual well-being. Examples include natural disasters, serious accidents, terrorist acts, war/combat, rape/sexual assault, historical trauma, intimate partner violence and bullying. . . .

People with PTSD have intense, disturbing thoughts and feelings related to their experience that last long after the traumatic event has ended. They may relive the event through flashbacks or nightmares; they may feel sadness, fear or anger; and they may feel detached or estranged from other people. People with PTSD may avoid situations or people that remind them of the traumatic event, and they may have strong negative reactions to something as ordinary as a loud noise or an accidental touch.

12.    As result of the Thailand rape and the violent physical assault by a fellow Airman, and the symptoms, emotions and behaviors that flowed from these events, Ms. Doe has been diagnosed multiple times as suffering from PTSD. The first PTSD diagnosis was made by a board-certified Air Force psychiatrist in July 2011. At that time, Dr. Thomas Green diagnosed Ms. Doe with PTSD and specifically linked the diagnosis to the rape that Ms. Doe experienced in Thailand.

13.    The Department of Veterans Affairs ("VA") also diagnosed Ms. Doe with PTSD. On April 27, 2016, three (3) months after Ms. Doe's discharge, Dr. Shahida B. Chowdhury (a VA psychiatrist) found that Ms. Doe screened positive for PTSD. On May 17, 2017, Dr. Maisley J. Paxton (a psychologist) in the VA Trauma Services Program, formally assessed Ms. Doe for PTSD and found that the "Veteran meets full diagnostic criteria for PTSD at this time." Dr. Paxton determined that the Thailand rape and the violent 2013 Air Force assault both were Criterion A traumas, *i.e.*, they were events that exposed Ms. Doe to "actual or threatened death, serious injury or sexual violence," which were sufficiently life-threatening and severe to support the PTSD diagnosis.

14.    By law, the VA must have "specialized teams" to process claims for compensation based on "military sexual trauma experienced by a veteran during service." 38 U.S.C. § 1166(a). The statute defines "military sexual trauma" or "MST" as "a physical assault of a sexual nature,

battery of a sexual nature, or sexual harassment during active military, naval, air, or space service." *Id.* § 1166(d)(2). *See also Myles v. United States*, 2022 WL 2296767, *2 n.1 (Fed. Cl. June 22, 2022). In accordance with this standard, on April 27, 2016, the VA, per Dr. Chowdhury, also screened Ms. Doe as positive for MST based on the 2013 assault by the male Airman. As noted in Ms. Doe's VA records at the time, "MST can occur on or off base and while a Veteran was on or off duty. Perpetrators can be anyone: men or women, military personnel or civilians, strangers, friends, or intimate partners. Examples of MST include a wide range of unwanted sexual experiences, including offensive behavior or remarks, unwanted sexual attention, or any unwanted sexual touching or other activity that occurred while the Veteran was unable to refuse, coerced (i.e. implied special treatment or hazardous duty or other negative consequences), threatened, or forced. Physical force may or may not be used and compliance does not indicate consent."

15. For more than four (4) years – the period from May 24, 2016 through October 2, 2020 – Ms. Doe was seen on a regular basis as an outpatient at the Washington, D.C., VA Medical Center by Dr. Elizabeth L. Greene (a psychiatrist). Foremost among Dr. Greene's diagnostic impressions about Ms. Doe was "Chronic PTSD (pre-military rape, physically assaulted in the military) with dissociative sx's [symptoms]." On the basis of the PTSD diagnosis, Dr. Greene supported disability accommodations for Ms. Doe to attend American University and to take the Medical College Admission Test. Ms. Doe attended ten (10) sessions of group psychotherapy administered by the VA Trauma Services Program from October 23, 2018 through December 10, 2019 to address her PTSD.

## III.    MS. DOE'S AIR FORCE MENTAL HEALTH AND MEDICAL HISTORY

16. The Thailand rape and 2013 violent assault gave Ms. Doe a complex mental health history while she was in the Air Force. She had a variety of symptoms from and after the rape and throughout her military service including, depression, anxiety, mood swings, panic attacks,

intrusive thoughts of prior traumatic events, inability to trust and withdrawing from others, loneliness, auditory and visual hallucinations, sleep disturbances and somatic symptoms such as racing heart rate. At the time that she was raped in Thailand, Ms. Doe had no access to mental health treatment. The PTSD that resulted from that rape therefore went undiagnosed and was not noted upon her entry into the Air Force in 2010. But the psychological vulnerability that stemmed from the rape existed nonetheless and began to manifest itself during Ms. Doe's first duty station assignment after basic training.

### A.    Bolling/Walter Reed (May 2011 – March 2012)

17.    Ms. Doe's mental health first began to deteriorate in the Air Force in 2011 when she was assigned to the Honor Guard at Joint Base Bolling-Anacostia ("Bolling"), in Washington, D.C. The Honor Guard renders military honors at the funerals of deceased Airmen. Ms. Doe experienced significant depression and anxiety due to the rigor of Honor Guard training, the "white-glove" inspections as well as participating in as many four (4) funerals per day. Given the violent rape she had experienced, the continual exposure to death and mourning was particularly stressful. Ms. Doe was also only one of five (5) Black women in the unit.

18.    Ms. Doe sought mental health assistance at Bolling and was prescribed the anti-depressant Paxil. Ms. Doe had a negative reaction to the medication and went to the emergency room where she expressed suicidal ideation with vague intent. For stabilization, Ms. Doe was admitted to the in-patient mental health unit at Walter Reed National Military Medical Center ("Walter Reed") for seven (7) days – from May 31 through June 6, 2011. Her diagnosis was adjustment disorder with depressed mood and substance induced mood disorder secondary to the drug reaction.

19.    Ms. Doe was admitted again to Walter Reed for six (6) days – from June 21 through June 27, 2011 – after reporting racing thoughts, morbid ideation, distressing dreams and concern

for her own safety. In connection with the second inpatient admission, Dr. Lissette W. Kolessar (a clinical psychologist) diagnosed Ms. Doe with adjustment disorder with mixed emotional features. Under the multiaxial system of diagnosis set forth in the Diagnostic and Statistical Manual of Mental Disorders IV-R ("DSM-IV-R"), Dr. Kolessar stated "[n]o psychiatric diagnosis" on Axis II. Axis II is where a personality order diagnosis ordinarily goes if it is deemed applicable by the psychologist.

20.    These inpatient admissions led to a change in Ms. Doe's military duties. She was reassigned from the Honor Guard detail to a less stressful position in personnel. These inpatient admissions also led to substantial mental health treatment for Ms. Doe at Bolling and Walter Reed over an eleven (11) month period through March 2012. Ms. Doe consulted with two (2) psychiatrists on six (6) occasions. As noted in paragraph 12 above, Dr. Thomas Green (a board-certified psychiatrist) had three (3) encounters of 80 minutes or more each with Ms. Doe and diagnosed her with "Posttraumatic Stress Disorder" as well as with "Adjustment Disorder with Mixed Anxiety and Depressed Mood." Dr. Green reported "No Diagnosis on Axis II," i.e., he found no personality disorder. Based on her mental health picture, which included PTSD, Dr. Green recommended that Ms. Doe be put on duty limitations, which included no deployment, no permanent change in station, no travel beyond fifty (50) miles of a hospital, no arming, no access to top secret classified information and that Ms. Doe be assigned to the day shift only.

21.    Dr. David B. Hammer (another psychiatrist), had three (3) encounters with Ms. Doe of more than an hour each. Dr. Hammer diagnosed Ms. Doe with "Adjustment d/o [disorder] with disturbance of mood and conduct." Dr. Hammer did not diagnose Ms. Doe with personality disorder either and merely noted "Strong cluster B traits" on Axis II.

22.    Ms. Doe also had eighteen (18) separate sessions of psychotherapy with Dr. Kolessar whose diagnoses included "Adjustment Disorder with Depressed Mood," "Adjustment disorder with mixed emotional features," and "Anxiety Disorder NOS [not otherwise specified]." Dr. Kolessar consistently reported "[n]o psychiatric diagnosis on Axis II." Dr. Kolessar noted that Ms. Doe had, at one point, been placed on the High Interest List which happens when an Airman has been identified as requiring heightened monitoring for risk of harm to self or others. Dr. Kolessar also considered Ms. Doe for disability evaluation by a Medical Evaluation Board on the basis of possible bipolar disorder and assigned her a Code 37 (MEB pending), but later withdrew that designation and it was removed.

23.    In none of these multiple interactions with Ms. Doe over nearly a year did any of the three (3) providers identified above diagnose Ms. Doe with a personality disorder.

**B.    Tyndall Air Force Base (February 2013 – September 2015)**

24.    Ms. Doe requested and obtained permission to transfer out of Honor Guard and retrain as an Aerospace Medical Technician. After completing that training, she was transferred to Tyndall Air Force Base in Florida to perform duties as a family medical health technician. While Ms. Doe's mental well-being had improved with the new military specialty, duty assignment and duty station, it deteriorated significantly again after the January 1, 2013 physical assault. Many of the moods and other symptoms that had plagued her before recurred. In particular, intrusive thoughts of the Thailand rape returned.

25.    Ms. Doe first sought professional mental health assistance at Tyndall on February 28, 2013, after the assault by the male Airman. On fourteen (14) occasions between February 28, 2013 and August 26, 2015, Ms. Doe was seen by Dr. Angelia Berry (a clinical psychologist), Dr. Jason Richards (a psychologist), Dr. Justin Wiley (a clinical psychologist), Dr. Letitia Chukwumah (a psychiatrist) and Dr. Norman Kruedelbach (a psychologist). Dr. Berry diagnosed Ms. Doe with

adjustment disorder with mixed anxiety and depressed mood and deferred any Axis II diagnosis. Dr. Richards diagnosed Ms. Doe with adjustment disorder with mixed anxiety and depressed mood and also deferred any diagnosis on Axis II. Dr. Wiley diagnosed Ms. Doe with adjustment disorder with anxiety and depressed mood, and recorded no Axis II diagnosis. Dr. Chukwumah diagnosed Ms. Doe with adjustment disorder, rule out bipolar and later with Anxiety Disorder NOS, rule out borderline traits. Dr. Kruedelbach deferred to Dr. Chuckwumah's diagnoses. Like the Bolling/Walter Reed providers, none of the Tyndall providers, who saw Ms. Doe for more than two (2) years, diagnosed her with a personality disorder.

26.    Ms. Doe's mental health picture deteriorated significantly again in August 2015, in the face of the stress of new duties and challenges after her promotion to Staff Sergeant. On August 27, 2015, Ms. Doe expressed suicidal ideation in a visit with her primary care manager ("PCM"). As a result, Ms. Doe was hospitalized at the Emerald Coast Behavioral Hospital ("ECBH"), a civilian facility. Ms. Doe was an inpatient at ECBH for twenty-seven (27) days. The ECBH admission was a dehumanizing and debilitating experience for Ms. Doe. During half of the stay at ECBH, Ms. Doe was separated from other Service Members and confined to the isolation ward with little entertainment, communication or access to sunlight or the outdoors. She had to room with a seriously disturbed patient whose conduct deprived Ms. Doe of needed sleep. Ms. Doe found the atmosphere at ECBH hostile and oppressive. Hospital staff confronted her in an adversarial, accusatory manner and with demeaning and racist remarks. Ms. Doe was discharged from ECBH on September 24, 2015 with a diagnosis of "Borderline Personality Disorder and Malingering."

27.    Upon her release from the hospital, and based upon her mental health picture, Ms. Doe was relieved of her duties as a family health clinic technician and was reassigned to the

reception desk of the optometry clinic. This low-level post was not befitting of a Staff Sergeant, but Ms. Doe was never returned to her post as a family health clinic technician or reassigned to more demanding duties. She served in the receptionist role until she was discharged in January 2016.

### C.    Ms. Doe's Physical Conditions in the Air Force

28.    In addition to her mental health challenges, Ms. Doe suffered from several physical disabilities during her service. Ms. Doe had a history of headaches commencing as early as May 2011 and which were ultimately diagnosed as migraine headaches. These headaches were a frequent focus of medical treatment, both in the emergency room and in the outpatient clinic, throughout Ms. Doe's service. Ms. Doe lost at least two (2) weeks of sick leave while in the Air Force due to migraine headaches.

29.    Ms. Doe also suffered from fibromyalgia while she was in the Air Force. This condition went largely un- or under-diagnosed until the Air Force sent Ms. Doe to a civilian specialist. On October 13, 2015, Ms. Doe was diagnosed with primary fibromyalgia, by Dr. Magaly Villafradez-Diaz, a civilian rheumatologist to whom Ms. Doe had been referred by her PCM. Dr. Villafradez-Diaz based this diagnosis upon Ms. Doe's symptoms of fatigue and diffuse pain during the past five (5) years which had worsened during the past (3) years. Ms. Doe received treatment for fibromyalgia over a period of three (3) months, which was ongoing at the time of her separation and continued after her discharge. Throughout the period from 2016 through 2020 when VA psychiatrist Dr. Elizabeth Greene was treating Ms. Doe for PTSD, fibromyalgia was listed as one of Ms. Doe's "active psychosocial stressors."

30.    The combination of migraines and fibromyalgia took a physical toll on Ms. Doe. As she has described it:

Living with fibromyalgia and migraines significantly affected every aspect of my life while I was in service. … There were many days I struggled getting out of bed let alone function due to my lack of sleep and crippling body pain. Even feeling my service uniform rub against my skin caused me great discomfort. …

There were many days I would sit in the car over my lunch break and cry because of how much pain I was in. …

At times, my migraines became so severe and debilitating I had to seek emergency medical treatment. Dealing with fibromyalgia and migraines took a major toll on both my physical and mental health.

## IV.    MILITARY DISABILITY RETIREMENT AND VA DISABILITY COMPENSATION

31.    Mental health and physical conditions that arise during service can affect an Airman in two important ways. *First*, those conditions can render an Airman unfit for continued military service which, depending on the degree of unfitness, can entitle the Airman to medical retirement or separation with disability pay. *Second*, those same conditions, if they are found by the VA to be service-connected disabilities, can entitle the Airman to VA disability compensation after discharge. The military retirement/disability separation process compensates the Airman for a military career cut short due to unfitness. The VA system compensates the Veteran for the effect that her service-connected disabilities have on her potential civilian employability.

32.    Since 2007, and at the time of Ms. Doe's discharge, these two systems have been merged into a single Integrated Disability Evaluation System ("IDES"). Before IDES, the service branch determined military fitness separately from the VA's determination of disability for VA compensation purposes. Although the service branch and the VA were required by law to use the same VA Schedule for Rating Disabilities ("VASRD") to rate the severity of the disability, the service branch and the VA applied the VASRD separately. This often led to incongruous results where the military might rate the disability at 10% but the VA rated the same condition at 50%. To reduce such inconsistencies, Congress created IDES as a joint Department of Defense

("DoD")/VA process by which DoD determines whether ill or injured Service Members are fit for continued military service and the VA determines appropriate benefits for Service Members separated or retired for disability.

33.    After an Airman's conditions are screened by the local Deployment Availability Working Group ("DAWG"), the IDES process generally begins with a Medical Evaluation Board ("MEB"). The MEB determines whether, due to the mental health or physical conditions at issue, the Airman meets military retention standards. If the MEB determines that the conditions may prevent the Airman from reasonably performing their duties, the MEB refers the case to a Physical Evaluation Board ("PEB"). The PEB (through both an informal and formal stage as elected by the Airman) determines the Airman's military fitness.

34.    At the time of Ms. Doe's discharge, "unfitness" under DoD standards generally meant that the Airman was "unable reasonably to perform" her duties. *Disability Evaluation System (DES)*, DoD Instruction ("DoDI") 1332.18, Encl. 3, App. 2 (Aug. 5, 2014). Similarly, the Air Force standard of unfitness was that the Airman "is precluded from a reasonable fulfillment" of her duties. *Medical Examinations and Standards*, Air Force Instruction ("AFI") 48-123, ¶ 5.3.1.1 (Oct. 23, 2014).[3] *See also Valles-Pietro v. United States*, 159 Fed. Cl. 611, 614-15 (2022). Referral to IDES was mandatory if the Airman's mental health or physical conditions "may" prevent her from reasonable performance or fulfillment of military duty. DoD 1332.18, Encl. 3, App. 1 (Aug. 5, 2014). That is, IDES referral was a "low bar;" referral was required if there was

_____

[3] DoD and the Air Force issue various directives, instructions and manuals that govern subjects such as disability retirement and separation. *Keltner*, 165 Fed. Cl. at 488 n.7. DoD and Air Force instructions cited herein are to the versions in effect at the time of Ms. Doe's discharge, unless noted otherwise. These missives are not published in the Federal Register, but they nonetheless are given controlling effect by the Air Force in administrative proceedings. *Id.* This hinders an Airman in not only determining the extent of her current rights, but also in determining what her rights were at the time of discharge.

merely a question about fitness. *See LaBonte v. United States*, 2023 WL 3197825, *7 (Fed. Cl.

May 2, 2023).

35.    "Reasonable" performance or fulfillment of duties is not an "either or" situation

but, rather, contemplates that the condition might have a range of impacts on duty performance.

This is why the unfitting condition is given a disability rating. However, under IDES, once the

PEB determines a condition is unfitting, the VA assigns the disability rating to the unfitting

condition. *Keltner*, 165 Fed. Cl. at 492. Therefore, whether it is for military retirement/disability

separation or for VA compensation purposes, the same condition gets a single rating from the VA.

*Id.* at 492 n.22. Since 2008, the service branches have been required to adhere to VA disability

ratings that the VA has assigned to conditions determined by a PEB to be unfitting pursuant to

IDES. *Id.* at 492.

36.    Under IDES, for an Airman like Ms. Doe with less than twenty (20) years of

service, a mental health or physical condition that occurred or was aggravated while the Airman

was entitled to basic pay, that is unfitting, permanent and stable, that was not the result of the

Airman's misconduct, was incurred in the line of duty, and that has a rating by the VA of at least

thirty (30) percent, entitles the Airman to medical retirement from the Air Force. 10 U.S.C. §

1201. Among other things, the retired Airman receives monthly disability payments for life. If

the condition at issue is rated by the VA at less than thirty (30) percent, the Airman is separated

with a lump sum disability payment. 10 U.S.C. § 1203.

37.    Not all mental health or physical conditions are eligible for evaluation as unfitting

conditions pursuant to IDES. Certain mental health and physical conditions that interfere with

military service are not required to be processed by IDES. Conditions such as personality disorder

or sleepwalking are considered to render the Airman "unsuitable" as opposed to "unfit" for military

service. An Airman whose only issue is an unsuitable mental health or physical condition may be administratively discharged without referral to IDES. *Administrative Separation of Airmen*, AFI 36-3208 ¶ 5.11 (July 2, 2013). However, an Airman who has both a potentially unfitting as well as an unsuitable condition cannot be deprived of her right to be evaluated by IDES for the potentially unfitting condition. Her case must be made the subject of "dual action" which the Air Force defined as "[t]he case of a member who, in addition to the disability evaluation, also has some other nondisability separation action pending resolution along with the disability action." *Physical Evaluation for Retention, Retirement, and Separation*, AFI 36-3212 at 79 (Nov. 27, 2009); *see also* AFI 36-3208 ¶ 6.30 (July 2, 2013). If an Airman meets the statutory requirements for disability retirement or separation in 10 U.S.C. §§ 1201 & 1203, the Air Force has no authority or discretion to deprive her of those benefits, regardless of whether she would be otherwise administratively dischargeable on unsuitability grounds. Such benefits are "nondiscretionary and statutorily mandated." *Kelly v. United States*, 69 F.4th 887, 900 (Fed. Cir. 2023) (citing *Sawyer v. United States*, 930 F.2d 1577, 1580 (Fed. Cir. 1991)); *Yount v. United States*, 23 Cl. Ct. 372, 382-83 (1991).

## V.    MS. DOE'S ADMINISTRATIVE DISCHARGE PROCESS (OCTOBER 2015 – JANUARY 2016)

### A.    The One-Sided Command Directed Evaluation Disregards Ms. Doe's PTSD

38.    On October 19, 2015, approximately three (3) weeks after her release from ECBH, Ms. Doe was advised that she would be the subject of a mental health examination at the direction of her unit commander, Lt. Col. Michelle Montgomery. A command directed evaluation ("CDE") was conducted by Maj. Shannon C. Branlund, a clinical psychologist.

39.    Dr. Branlund concluded that Ms. Doe should be discharged because her ECBH diagnoses – Borderline Personality Disorder and Malingering – were "so severe that the member's

functioning in the military environment is significantly impaired" which deemed her "unsuitable for continued military service." Rather than an independent review of the case, Dr. Branlund relied on the civilian hospital's diagnoses. However, there is no evidence that Dr. Branlund actually reviewed any ECBH records as none were included in Ms. Doe's Air Force Records. Significantly, Dr. Branlund took no account of the fact that ECBH had actually reversed itself on the purported diagnosis of "malingering." Before Ms. Doe was released from ECBH, Dr. Brent Decker, a psychologist to whom Ms. Doe's case was referred by the psychiatrist at ECBH, concluded that "the patient presented a normal profile, with little indication that she was malingering." However, the false malingering diagnosis clearly poisoned the well as to the remainder of the CDE.

40.     In contrast to thirty-nine (39) separate encounters over a period of more than three (3) years that eight (8) Air Force mental health providers at Bolling, Walter Reed and Tyndall had with Ms. Doe, Dr. Branlund spent only 60 minutes with Ms. Doe. A large part of that meeting was explaining the administrative details of a CDE. Dr. Branlund did not meaningfully address the multiple other diagnosed mental health conditions reflected in Ms. Doe's records, and that contradicted the ECBH diagnoses, including the prior diagnoses of PTSD by a board-certified psychiatrist at Walter Reed (Dr. Thomas Green). The CDE stated that Ms. Doe had been assessed for PTSD "twice in the inpatient setting as well as in the outpatient setting, and was determined to not meet criteria for this condition." However, this is false. Ms. Doe had three (3) PTSD diagnoses by Dr. Green at Walter Reed. Dr. Branlund did not even review the Bolling/Walter Reed records, claiming that they were not in the AHLTA file. But those records were available when they were pulled for Ms. Doe on October 15, 2015, and should have been available to Dr. Branlund when she evaluated Ms. Doe four (4) days later on October 19, 2015.

41.    Dr. Branlund erroneously down-played Ms. Doe's high school rape, characterizing it as a "sexual assault" and describing the violent 2013 physical assault that re-triggered the PTSD symptoms as the "boyfriend '[p]utting his hands on her.'" These experiences should not have been minimized. They are the very facts underlying Air Force Dr. Green's in-service PTSD diagnosis in 2011 and the PTSD diagnoses of VA Drs. Chowdhury, Paxton and Greene in 2016 and 2017. Both incidents meet DSM Criterion A for PTSD, i.e, both incidents exposed Ms. Doe "to actual or threatened death, serious injury, or sexual violence," and either incident, standing alone, is enough to support a PTSD diagnosis.

**B.    The Air Force Improperly By-Passed IDES in Ms. Doe's Case**

42.    Dr. Branlund concluded that, because Ms. Doe's only mental health issue was a personality disorder which purportedly rendered her unsuitable for military service, there was no need for an MEB to evaluate Ms. Doe for unfitness for purposes of disability retirement or separation. This was inaccurate. The mental health record at the time plainly indicated that, at a minimum, PTSD and personality disorder were conditions that were comorbid with Ms. Doe. As was confirmed later by VA psychiatrist Dr. Greene, symptoms of PTSD and borderline personality disorder often overlap and are not infrequently comorbid conditions in the same patient. Because Ms. Doe presented with a potentially unfitting condition (PTSD) and a potentially unsuitable condition (personality disorder), the Air Force was required to process her case as a dual action case. That is, the Air Force was required to process her case through the administrative discharge route simultaneously with the IDES route. AFI 36-3212 at 79 (Nov. 27, 2009); AFI 36-3208 ¶ 6.30 (July 2, 2013). The failure to do so was a material and prejudicial error. A diagnosis of personality disorder in an Airman does not preclude the Airman's access to IDES for the consideration of unfitting mental health conditions. *Bosch v. United States*, 27 Fed. Cl. 250 (1992).

43.    At the time of the CDE, IDES referral was mandatory for a mental health condition that "*may* … prevent the Service member from reasonably performing the duties of their office." DoDI 1332.18, Encl. 3, App. 1, ¶ 2.a(1) (Aug. 5, 2014) (emphasis added).  Thus, IDES referral was required if there was merely a question about the Airman's fitness.  The record at the time of the CDE clearly raised at least a question whether Ms. Doe could reasonably perform her duties in light of her mental health picture.  By that point in time, (a) Ms. Doe's in-service PTSD diagnosis had resulted in significant limits on her deployability; (b) she was proposed for an MEB in 2011 on mental health grounds; (c) she endorsed PTSD symptoms on her periodic health assessments and was noted at risk for PTSD on multiple occasions; (d) she underwent mental health treatment throughout three (3) of the five (5) years she was in the Air Force; (e) she was hospitalized three (3) separate times for periods of six (6), seven (7) and twenty-seven (27) days respectively due to suicidal thoughts, anxiety, depression and other issues; (f) due to her mental health issues, she was reassigned to lower-stress duties – from Honor Guard to personnel in 2011 and from family health clinic technician to optometry receptionist in 2015; and (g) her commanding officer and the CDE evaluating officer both found that Ms. Doe's functioning in the military environment was "significantly impaired" by her mental health condition.  If this did not at least raise a question about fitness on mental health grounds, it is hard to know what would.

44.    Dr. Branlund's CDE likewise improperly by-passed IDES with respect to Ms. Doe's physical conditions.  It is undisputed that fibromyalgia and migraine headaches are both potentially unfitting conditions but neither was referred to IDES.  Ms. Doe told Dr. Branlund about the fibromyalgia diagnosis by the civilian doctor, and the PCM was aware that Ms. Doe should be presented to the DAWG to determine if her physical condition justified an MEB.  Prior to the discharge, certain of Ms. Doe's mental health providers – Drs. Chukwumah and Soper – also knew

of Ms. Doe's fibromyalgia diagnosis. But there is no record of what was presented to DAWG or whether DAWG actually evaluated Ms. Doe's fibromyalgia. Dr. Branlund recorded a note on November 17, 2015 that "DAWG confirms there are no requirements for MEB." But Ms. Doe's medical records from the doctor who diagnosed her with fibromyalgia were not transmitted to the PCM until December 9, 2015, about three (3) weeks after the final results of the CDE were delivered to Ms. Doe. And there is no indication in Ms. Doe's record of any further contact by the PCM with DAWG about fibromyalgia or any other physical condition after December 9, 2015 and prior to the discharge on January 14, 2016.

45.    Thus, despite clear-cut evidence of unfitness on mental health and physical grounds, the Air Force avoided IDES altogether. The action by the Air Force here – seizing upon an unsuitable condition (personality disorder) in order to quickly discharge an Airman without going through the process of evaluating the Airman for unfitting conditions (PTSD, fibromyalgia, migraines) for disability retirement or separation – was unfortunately not limited to Ms. Doe's case. As a study of military discharge procedures at the time found, it was a problem across service branches:

> [T]here were misplaced incentives operating on commanders and medical staff to prefer a PD [personality disorder] diagnosis to PTSD. Commanders preferred PD because, in contrast to PTSD, it was a diagnosis that allowed for quick dismissals and the deployment of a healthy replacement. In contrast, PTSD is considered service-connected and requires a medical board's assessment, a process that can take two years. During that time, the commander cannot get a healthy replacement for the soldier being considered for medical retirement. Similarly, doctors may face pressure to minimize service members' diagnoses to discharge troubled service members quick and minimize benefits. An Army psychologist was captured on tape saying, "Not only myself, but all the clinicians up here are being pressured to not diagnose PTSD.

Human Rights Watch, *Booted: Lack of Recourse for Wrongfully Discharged US Military Rape Survivors* at 37-38 (2016).

46.     Even as to the procedures that control an unsuitability discharge based on personality disorder, the Air Force failed to follow them in Ms. Doe's case.  At the time of Ms. Doe's discharge, a discharge on grounds of unsuitability required "documentation pre-dating the initiation of discharge showing that the airman has been formally counseled concerning deficiencies and afforded an opportunity to overcome them." AFI 36-3208 ¶ 5.11 (July 2, 2013). While Lt. Col. Montgomery affirmed that this requirement had been satisfied, there is no record, nor any evidence, that, before the discharge process began, Ms. Doe was actually counseled and actually given an opportunity to correct any deficiencies.  Lt. Col. Montgomery also asserted in her memorandum recommending the discharge that "[a]s outlined in my Mission Impact Statement, dated 18 November 2015, numerous efforts have been undertaken to rehabilitate SSgt Doe," but the Mission Impact Statement says nothing about any such "numerous efforts" at rehabilitation.

**C.     Ms. Doe's Discharge**

47.     Ms. Doe was offered an Honorable Discharge, which is not surprising since she had no non-judicial punishment, no "[r]ecord of disciplinary actions" and had earned the Good Conduct Medal.  Ms. Doe was discharged on January 14, 2016, with character of service "Honorable" but with a separation code "JFX" and a narrative reason for separation ("narrative reason") of "personality disorder."  Thus, Ms. Doe not only was denied her statutory rights to be evaluated by IDES for disability retirement or separation, her DD-214 carried the label "personality disorder."  The DD-214 is a form that sets forth a Veteran's service record and states the character of service and the reason for discharge.  It is a form that Veterans often must show to prospective employers or when applying for licenses or admission to schools.  Ms. Doe was ashamed, humiliated and embarrassed by the narrative reason stated on her DD-214.  The Air

Force itself classifies personality disorder as an "inherent defect." AFI 36-3212 at 79 (Nov. 27, 2009).

## VI.   THE VA DETERMINES THAT MS. DOE HAS A COMBINED DISABILITY RATING OF 100% FOR VARIOUS SERVICE-CONNECTED MENTAL HEALTH AND PHYSICAL CONDITIONS

48.     Because Ms. Doe's case was not referred to IDES, she applied for benefits from the VA separately for her mental health and physical conditions that were service-connected. As noted in paragraph 13 above, less than three (3) months after discharge, the VA diagnosed Ms. Doe with PTSD and MST, and Ms. Doe commenced treatment for PTSD at the VA in 2017. Ms. Doe also initiated the Compensation and Pension phase of the VA disability process which resulted in a series of disability rating decisions beginning in May 2016. Regardless of the fact that the Air Force had improperly by-passed IDES and never got to the bottom of Ms. Doe's disabilities, all of the mental health and physical conditions that the VA rated as disabling existed while Ms. Doe was in the Air Force or they would not have been found by the VA to be service-connected. As a result, Ms. Doe has been determined by the VA to be a 100% disabled Veteran from January 15, 2016 – the day after her discharge – with multiple mental health and physical disabilities. Moreover, these conditions are static, which means that they are not subject to re-examination by the VA.

49.     On May 17, 2016, the VA gave Ms. Doe's mental health condition a 70% disability rating for major depressive disorder and generalized anxiety disorder from January 15, 2016. The VA increased the disability rating to 100% on March 29, 2017, based on a revised determination of schizoaffective disorder. After further review and input from Dr. Greene, who was simultaneously treating Ms. Doe for PTSD, the VA revised its assessment of Ms. Doe's mental health condition and corrected its determination to PTSD. On September 17, 2020, the VA ruled that Ms. Doe "meets the diagnostic criteria for PTSD according to the DSM-V." The rating

decision noted the VA examiner's statement that Ms. Doe "does not meet [the] diagnostic criteria for another diagnosis." The VA rated her PTSD as "100 percent disabling," which is the "highest schedular evaluation allowed under the law for posttraumatic stress disorder." The VA also determined that Ms. Doe's PTSD is a "Static Disability."

50.    On March 29, 2017, the VA gave Ms. Doe a 50% disability rating for migraine headaches, effective April 8, 2016. The VA classified the migraines as a "Static Disability" on February 1, 2021.

51.    On May 17, 2016, the DVA rated Ms. Doe's fibromyalgia as 40% disabling, the highest schedular rating for that condition from January 15, 2016. On February 1, 2021, the VA ruled that Ms. Doe's fibromyalgia is "static and not subject to future review examination."

52.    The VA determined that certain of Ms. Doe's other conditions are service-connected at the following degrees of disability, all of which are classified by the VA as a "Static Disability:" hidradenitis suppurativa with gluteal scarring and herpes simplex virus II (60% from January 15, 2016); gastroesophageal reflux disorder, irritable bowel syndrome, and gastritis (30% from January 15, 2016); cervical strain (10% from January 15, 2016); lumbosacral strain (10% from January 15, 2016); tinnitus (10% from January 15, 2016); recurrent urinary tract infections (10% from January 15, 2016). The VA also determined that Ms. Doe had certain other service-connected disabilities as of January 15, 2016, but rated them as zero (0%) percent disabling: allergic rhinitis and vocal cord dysfunction; bacterial vaginosis; and dysmenorrhea.

## VII.  DOD AND CONGRESS LIBERALIZE THE STANDARDS FOR CORRECTION BOARD CASES INVOLVING PTSD AND MST

53.    An Airman who believes that she has been assigned an erroneous reason for discharge or who believes she has been erroneously denied disability retirement or separation benefits by the Air Force may file a petition for relief with the Air Force Board for the Correction

of Military Records ("AFBCMR" or "Board").  Exercising the power conferred by Congress on

the Secretary of the Air Force, the Board may "correct any military record of the [Air Force]"

when the Board "considers it necessary to correct an error or injustice."  10 U.S.C. § 1552(a).

Such errors include errors in the narrative reason for a discharge as well as errors made in denying

disability retirement or separation.  *Thomassee v. United States*, 158 Fed. Cl. 233, 235 (2022).  The

Board has the authority to make a disability determination in the first instance.  *Id.*

54.    In or about the time of Ms. Doe's discharge, DoD began to recognize and correct

various inequities and injustices that had arisen in the military discharge process.  This included

the problems noted by human rights advocates in which Service Members with PTSD were being

unfairly discharged on grounds of personality disorder, (see paragraph 45 *supra*), as well as a

review by the DoD's Inspector General that assessed the stigmatizing effect of using "personality

disorder" as the narrative reason for discharge in the Service Member's DD-214, particularly

where the Service Member was a victim of MST.  *See* Inspector General, DoD, Report No.

DODIG-2016-088, *Evaluation of the Separation of Service Members Who Made a Report of

Sexual Assault* (May 9, 2016).  Accordingly, DoD issued a series of guidance directives to the

various boards for the correction of military records that are relevant to this case, in particular, for

cases involving PTSD and MST.

55.    On September 3, 2014, Secretary of Defense Chuck Hagel issued a memorandum

("Hagel Memorandum")[4] directing that all correction boards "will fully and carefully consider

every petition based on PTSD brought by each veteran. This includes a comprehensive review of

all materials and evidence provided by the petitioner."  In other words, cases involving PTSD

---

[4] Memorandum for Secretaries of the Military Departments Re: "Supplemental Guidance to Military Boards for Correction of Military/Naval Records Considering Discharge Upgrade Requests by Veterans Claiming Post Traumatic Stress Disorder" (Sep. 3, 2014).

before the boards are not limited to the service records that existed at the time of discharge because "Service treatment records or personnel records" very often "do not contain substantive information concerning medical conditions."

56.    On August 25, 2017, the Under Secretary of Defense, A.M. Kurta issued a memorandum ("Kurta Memorandum")[5] to further clarify how correction boards should consider cases brought by "veterans with mental health conditions, or who experienced sexual assault or sexual harassment." The Kurta Memorandum directed that "[l]iberal consideration will be given to veterans petitioning for discharge relief when the application for relief is based in whole or in part on matters relating to mental health conditions, including PTSD; TBI [traumatic brain injury]; sexual assault; or sexual harassment." The Kurta Memorandum set out several considerations relevant to PTSD cases that are specific and pertinent to the instant case:

> The veteran's testimony alone, oral or written, may establish the existence of a condition or experience, that the condition or experience existed during or was aggravated by military service and that the condition or experience excuses or mitigates the discharge.  * * *

> Evidence that may reasonably support more than one diagnosis should be liberally considered as supporting a diagnosis, where applicable, that could … mitigate the discharge.  * * *

> A diagnosis made by a licensed psychiatrist or psychologist that the condition existed during military service will receive liberal consideration.

> A determination made by the Department of Veterans Affairs (VA) that a veteran's mental health condition, including PTSD; TBI; sexual assault; or sexual harassment is connected to military service, while not binding on the Department of Defense, is persuasive evidence that the condition existed or experience occurred during military service.  * * *

---

[5] Memorandum for Secretaries of the Military Departments Re: "Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of Their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment" (Aug. 25, 2017).

> Evidence that may reasonably support more than one diagnosis or a change in diagnosis, particularly where the diagnosis is listed as the narrative reason for discharge, will be liberally construed as warranting a change in narrative reason to "Secretarial Authority," "Condition not a disability," or another appropriate basis.

57.    On July 25, 2018, Under Secretary of Defense Robert L. Wilkie issued a memorandum ("Wilkie Memorandum")[6] that reaffirmed the Hagel and Kurta Memoranda.  The Wilkie Memorandum also set out two additional considerations relevant to the instant case:

> Changes in policy, whereby a Service member under the same circumstances today would reasonably be expected to receive a more favorable outcome than the applicant received, may be grounds for relief.  * * *

> Requests for relief based in whole or in part on a mental health condition, including post-traumatic stress disorder (PTSD); Traumatic Brain Injury (TBI); or a sexual assault or sexual harassment experience, should be considered for relief on equitable, injustice, or clemency grounds whenever there is insufficient evidence to warrant relief for an error in impropriety.

58.    The Hagel, Kurta and Wilke Memoranda are binding upon the AFBCMR.  *Doyon v. United States*, 58 F.4th 1235, 1247-48 (Fed. Cir. 2023); *Keltner*, 165 Fed. Cl. at 510-11; *Hassay v. United States*, 150 Fed. Cl. 467, 483-84 (2020).  The principle of "liberal consideration" set forth in these Memoranda applies to the AFBCMR's consideration, not only of Ms. Doe's claim to correct the narrative reason for discharge in her DD-214, but also to the Board's consideration of Ms. Doe's claim that the Air Force improperly denied her disability retirement or separation. *LaBonte*, 2023 WL 3197825 at*11; *Hassay*, 150 Fed. Cl. at 483-84.  Furthermore, the liberal consideration outlined in the Kurta Memorandum applies to any aspect of a case that involves PTSD.  *Ford v. United States*, 170 Fed. Cl. 458, 468 (2024).

---

[6] Memorandum for Secretaries of the Military Departments Re: Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Regarding Equity, Injustice, or Clemency Determinations (July 25, 2018).

59.    Congress also has amended the statute governing correction board proceedings to adopt liberal consideration and other procedures pertinent to this case.  In the case of a Veteran whose discharge review claim "is based in whole or in part on matters relating to post-traumatic stress disorder . . . and whose post-traumatic stress disorder . . . is related to . . . military sexual trauma . . . [the] board shall:"

> (A) review medical evidence of the Secretary of Veterans Affairs or a civilian health care provider that is presented by the claimant; and
>
> (B) review the claim with liberal consideration of the claimant that post-traumatic stress disorder . . . potentially contributed to the circumstances resulting in the discharge . . . or to the original characterization of the claimant's discharge. . . .

10 U.S.C. § 1552(h)(1) & (h)(2)(A)-(B).

60.    In any AFBCMR case involving a Veteran diagnosed with a mental condition while serving in the armed forces, the Board shall obtain "the opinion of a clinical psychologist or psychiatrist if the request for correction of records concerned relates to a mental health disorder." 10 U.S.C. § 1552(g)(1).  Deborah Lee James, the Secretary of the Air Force, stressed this requirement in a memorandum to the AFBCMR dated November 2, 2016,[7] that underscored the "tremendous emphasis" that Congress and the Secretary of Defense had placed on DoD's response to "invisible wounds" such as PTSD.  The Secretary directed that any medical advisory related to a mental health condition during an applicant's military service "must contain the opinion of a clinical psychologist or psychiatrist."  The Secretary "authorized the addition of two psychiatrists and a psychologist" for this purpose.

---

[7] Memorandum for Chair, Vice Chair, Panel Chairs, and Members, Air Force Board for Correction of Military Records (AFBCMR) Re: "Supplemental Guidance to AFBCMR on Invisible Wounds and Sexual Assault" (Nov. 2, 2016).

61.     Further and more specific statutory requirements apply to a case, like Ms. Doe's, that not only involves a mental health condition but also involves PTSD that is related to MST.  In such a case, the Board shall seek "advice and counsel . . . from a psychiatrist, psychologist, or social worker with training on mental health issues associated with post-traumatic stress disorder." 10 U.S.C. § 1552(g)(2).  In a case involving PTSD related to MST "in which sexual trauma [or] intimate partner violence . . . is claimed" – which is applicable to Ms. Doe given the January 1, 2013 assault by the intimate partner fellow Airman – "the board shall seek advice and counsel in the review from an expert in trauma specific to sexual assault [or] intimate partner violence . . . ." *Id.* § 1552(g)(3).

## VIII.   PROCEEDINGS BEFORE THE AIR FORCE BOARD FOR THE CORRECTION OF MILITARY RECORDS

62.     On May 21, 2021, Ms. Doe filed her Form DD-149, "Application for Correction of Military Record," with the AFBCMR seeking review of her January 14, 2016 discharge on the grounds that she was improperly denied review by IDES and therefore the Air Force improperly denied her the benefits of disability retirement and/or disability separation.  Case No. BC-2021-XXXXX.  Based on the diagnoses contained in the mental health and medical records of both the Air Force and the VA, as well as the VA ratings decisions pursuant to which the VA determined that Ms. Doe has service-connected static disabilities collectively rated at 100% as of the date of her discharge, Ms. Doe asserted that the Board should correct her military record to reflect either that she receive disability retirement or disability separation as of January 14, 2016.  Such relief is warranted because the record leaves no question that Ms. Doe had mental health and medical conditions that rendered her unfit for military service.  Since the VA had given her a combined disability rating of 100% for the service-connected disabilities that render her unfit, and since, in the IDES system, VA ratings would be binding on an Air Force PEB in rating the degree of

unfitness, the record more than amply sustains the 30% and/or 10% disability necessary, respectively, for disability retirement or separation under 10 U.S.C. §§ 1201 & 1203. Ms. Doe also sought correction of her DD-214 narrative reason for discharge to remove the stigmatizing "personality disorder" designation. In connection with her application to the Board, Ms. Doe submitted a brief and four (4) sets of comments on the various advisories obtained by the Board; nearly 2,500 pages of mental health records, medical records and other exhibits; three (3) declarations of Ms. Doe made under penalty of perjury; and the opinion of the VA psychiatrist, Dr. Elizabeth Greene, who treated Ms. Doe for service-connected PTSD for four (4) years after her discharge.

### A.     The Psychological Advisory

63.     The Board obtained a psychological advisory on Ms. Doe's case that it made available on December 21, 2021.

64.     The psychological advisory was anonymous. It disclosed neither the name, the position nor the credentials of the advisor. Ms. Doe objected to this anonymity but was advised by the Board that this was "approved operating procedure consistent with FOIA rules." However, this was not a Freedom of Information Act case, and the Board gave no reason why it withheld the name and credentials of the psychological advisor but disclosed the name and credentials of the medical advisor. As a result of the unexplained anonymity, there was no evidence that the psychological advisory complied with statutory requirements, namely, that it be by "a clinical psychologist or psychiatrist," 10 U.S.C. § 1552(g)(1), and that it be by "a psychiatrist, psychologist or social worker" with expertise in PTSD and sexual trauma or intimate partner violence. *Id.* § 1552(g)(2)-(g)(3).

65.     The psychological advisory attempted to explain away Ms. Doe's PTSD on the ground that it existed prior to service ("EPTS") and was not aggravated in service. This ignored

the fact that, putting aside the pre-service rape, the 2013 assault itself was found by the VA psychiatrists to be a Criterion A trauma sufficient to support a finding of in-service PTSD. By direction of the Kurta Memorandum, a VA determination that PTSD is service-connected is "persuasive evidence" that the PTSD occurred during service. The psychological advisory had no explanation why this "persuasive evidence" was not controlling.

66. The psychological advisory also ignored the VA's determination that, to the extent that Ms. Doe's PTSD was EPTS, it was aggravated in service by the 2013 assault. "Service aggravation" of an EPTS condition for purposes of determining military unfitness occurs when there is a "permanent worsening of a pre-service condition over and above natural progression." *Line of Duty (LOD) Determinations, Medical Continuation (MEDCON), and Incapacitation (INCAP) Pay*, AFI 36-2910 ¶ 1.10.1.2 (Oct. 8, 2015). "Natural progression," in turn, is the course that a condition "would take over time regardless of military service." *Id*. The psychological advisory did not explain why a violent assault, in which Ms. Doe was confronted with death or serious physical injury, would not have aggravated her PTSD, or why the VA's determinations to that effect were not "persuasive evidence" of service aggravation. Nor did the psychological advisory explain why Ms. Doe's sworn description of the triggering effect that the 2013 assault had on her did not demonstrate service aggravation. The psychological advisory ignored Ms. Doe's declaration altogether.

67. Any aggravation of an EPTS condition is presumed to be in the line of duty, and the government has the burden of showing otherwise. *Wollman v. United States*, 116 Fed. Cl. 419, 427 (2014). To demonstrate that an EPTS condition was not aggravated by service, it was incumbent upon the psychological advisory to establish that fact by "clear and unmistakable evidence," that is, "undebatable information that the condition ... was not aggravated by military

service." AFI 36-2910 ¶ 1.10.2.2.1.1 (Oct. 8, 2015). *See also Ford*, 170 Fed. Cl. at 466. The

psychological advisory cited to no evidence much less "undebatable" evidence that there was no

service-aggravation of Ms. Doe's PTSD. An advisory's mere opinion, without more, that a

condition was not aggravated by service is not sufficient to overcome the presumption or evidence

to the contrary. *Siegel v. United States*, 148 Cl. Ct. 420, 428 (1960).

68.    The psychological advisory determined that the only mental health condition that

Ms. Doe had at the time of discharge was personality disorder which rendered her unsuitable but

would not have rendered her unfit. This was contrary to fact as it ignored the comorbidity of Ms.

Doe's mental health conditions. As VA psychiatrist Dr. Elizabeth Greene observed, "symptoms

of PTSD and BPD [borderline personality disorder] often overlap and are not infrequently

comorbid conditions in the same patient." Indeed, because of this overlap in symptoms, "***it is***

***impossible to determine with any degree of medical certainty*** whether Ms. Doe's psychiatric

hospitalizations were due to BPD vs. PTSD. The symptoms and conduct that led to her

hospitalizations could just have likely been attributable to PTSD as to BPD or both. ***It cannot be***

***neatly separated out***." (Emphasis added). As Dr. Greene further observed regarding Ms. Doe's

mental condition at time of discharge:

> PTSD tends to be a chronic condition that can vary in intensity throughout a
> person's life. Ms. Doe told me she experienced a violent sexual assault at 17 years
> old before joining the military. She was able to suppress those memories until she
> was physically assaulted by a boyfriend in the military a few years later. At that
> time, memories of the prior assault resurfaced, and her mental health worsened.
> She was in mental health treatment throughout the rest of her military career, and
> she continued mental health treatment at the VA. ***Clearly, the PTSD was not***
> ***resolved by the time she was discharged from the Air Force in 2016.*** [Emphasis
> added.]

The anonymous psychological advisor had an opportunity to respond to Dr. Greene's opinions but

failed to do so. The opinion of a treating psychiatrist like Dr. Greene is "especially relevant," and

the fact that the psychological advisory ignored Dr. Greene's opinion entirely is erroneous.

*Hassay*, 150 Fed. Cl. at 480.  Unlike the anonymous psychological advisor who never examined Ms. Doe, Dr. Greene treated Ms. Doe for PTSD for more than four (4) years and therefore was in a vastly superior position to assess Ms. Doe's condition.

69.    The psychological advisory never explained why, if Ms. Doe did not have PTSD in the Air Force, the VA treated her for it for more than four (4) years after discharge as a service-connected disability.  The psychological advisory never disputed the validity of the VA PTSD diagnoses or treatment regimens or determinations of service-connection.  The psychological advisory asserted that the VA found that borderline personality disorder was the "primary condition influencing [Ms. Doe's] behaviors" but cited nothing in support, and this assertion was in fact false.  Dr. Greene consistently stated throughout the course of Ms. Doe's treatment – and in her opinion submitted to the Board – that "Ms. Doe's primary diagnosis was Chronic Post-Traumatic Stress Disorder."

70.    The psychological advisory claimed that, at the time of discharge, "[t]he DAWG reviewed [Ms. Doe's] records and found she did not have any potentially unfitting mental health conditions," but this was not true either.  There is no evidence (and the psychological advisory pointed to none) that the DAWG reviewed Ms. Doe's mental health records or assessed Ms. Doe's mental health conditions.  To the contrary, the record shows that the only thing that the CDE evaluator directed the PCM to present to the DAWG were Ms. Doe's "medical diagnoses."  Indeed, as the contemporaneous medical advisory opinion submitted to the Board ironically acknowledged, "medical" in this context means "physical," not mental health.  No mental health issues were presented to the DAWG because Major Branlund had already determined (incorrectly) that Ms. Doe's only mental health issue was personality disorder – an unsuiting mental health condition that requires no IDES processing.

71.   The psychological advisory brushed aside all of the VA PTSD diagnoses, treatments and service-connected determinations, on the ground that military fitness determinations and VA disability determinations serve different purposes.   This was erroneous because, regardless of the differing purposes, VA disability determinations are relevant and must be considered by the Board in cases involving questions of military fitness. *Valles-Pietro*, 159 Fed. Cl. at 618; *Keltner*, 165 Fed. Cl. at 506; *Stine v. United States*, 92 Fed. Cl. 776, 795 (2010).   VA rating decisions rendered within the 12-month period following discharge are particularly relevant. *Keltner*, 165 Fed. Cl. at 506; *Petri v. United States*, 104 Fed. Cl. 537, 566 (2012).   Indeed, the Board has based medical separation/retirement disability determinations solely on the basis of VA rating decisions issued only a few months after the service member's discharge.   AFBCMR No. BC-2020-02610 (Feb. 17, 2021), AFBCMR No. BC-2007-02990-4 (Aug. 19, 2020).   In fact, the Board itself ordered that an Airman be considered for a MEB based on a VA rating decision that was issued less than nine (9) months after the Airman went into the retired reserve.   AFBCMR No. BC-2007-00684 (June 21, 2007).

72.   The psychological advisory confined its analysis to what it claimed was the "snapshot" of Ms. Doe's mental health picture at the time of discharge and determined on that basis that Ms. Doe had no unfitting mental health conditions that would have interfered with her performance of military duties.   But even this narrow "snapshot" refuted the psychological advisory's conclusions.   By the time of discharge, (a) Ms. Doe's in-service PTSD diagnosis had resulted in significant limits on her deployability; (b) she was proposed for an MEB in 2011 on mental health grounds; (c) she endorsed PTSD symptoms on her periodic health assessments and was noted at risk for PTSD on multiple occasions; (d) she underwent mental health treatment throughout three (3) of the five (5) years she was in the Air Force; (e) she was hospitalized three

(3) separate times for periods of six (6), seven (7) and twenty-seven (27) days respectively due to suicidal thoughts, anxiety, depression and other issues; (f) due to her mental health issues, she was reassigned to lower-stress duties – from Honor Guard to personnel in 2011 and from family health clinic technician to optometry receptionist in 2015; and (g) her commanding officer and the CDE evaluating officer both found that Ms. Doe's functioning in the military environment was "significantly impaired" by her mental health condition. In other words, the "snapshot" was loaded with facts showing Ms. Doe's unfitness, and the psychological advisory improperly ignored them all. *See Verbeck v. United States*, 89 Fed. Cl. 47, 69 (2009).

73.   The psychological advisory relied on the diagnoses of the civilian hospital (ECBH) but never acknowledged that an ECBH psychologist ran a second set of tests on Ms. Doe and determined that she was not a malingerer. Nor did the psychological advisory assess the extent to which this false determination of malingering had unduly influenced what became a wholly one-sided and legally erroneous CDE by Major Branlund.

74.   The psychological advisory determined that Ms. Doe was not a victim of MST because the 2013 assault was supposedly not a "sexual assault." This ignored the fact that the assault was at the hands of an intimate partner that took place, in part, in Ms. Doe's hotel bedroom. It also ignored the statutory definition of MST which also includes "sexual harassment during active military service." 38 U.S.C. § 1166(d)(2). The fact that the Airman who assaulted Ms. Doe continued to stalk her in the aftermath of the assault clearly constitutes "sexual harassment." The psychological advisory failed to explain why these facts do not constitute MST and cited nothing to support the psychological advisory's conception of MST.

75.   The psychological advisory agreed that a change to the narrative reason on Ms. Doe's DD Form 214 was "necessary for confidentiality purposes" but asserted that it should be

"Condition Not a Disability" not "Secretarial Authority" due to "safety concerns" because Ms. Doe allegedly is a suicide risk. No evidence supports this. As Dr. Greene observed, "[w]hile Ms. Doe has experienced suicidal ideation in the past, it's always been considered 'passive,' meaning without intention to act. She has no history of suicide attempts. I have not known her to be violent towards others. Her mental health conditions do not raise a safety issue." Even if it were true that Ms. Doe is a suicide risk (and it is untrue), the psychological advisory failed to explain why putting "Condition not a Disability" on the DD-214 would have any relevance in preventing suicide.

76.    While the "Condition Not a Disability" narrative recommended by the psychological advisory is less disparaging than "personality disorder," it is not factually accurate since it is clear that Ms. Doe has mental health disabilities that were part of the mental health picture that led to her discharge. It also is not accurate legally because the record clearly showed that Ms. Doe was entitled to disability retirement and/or disability separation in accordance with 10 U.S.C §§ 1201 & 1203.

77.    The anonymous psychological advisor's multiple failures to consider relevant evidence, multiple false statements of fact and other flaws and errors as outlined in paragraphs 64-76 above were all presented in Ms. Doe's comments to the Board. The anonymous psychological advisor never even responded to, let alone made any attempt to rebut, any of these arguments.

**B.    The Medical Advisories**

78.    The Board obtained three (3) medical advisories on Ms. Doe's case that it made available on December 21, 2021 ("1st medical advisory"), August 29, 2022 ("2d medical advisory") and November 29, 2022 ("3d medical advisory"), respectively. All three medical advisories were filled with legal and factual errors and misrepresentations of the record.

**1.    The 1st medical advisory**

79.     The 1st medical advisory stated that "[s]pecialty consultations in Rheumatology, Dermatology, Gastroenterology, Cardiology, Allergy and Immunology, Pulmonology, Orthopedic, Ophthalmology, Neurology, and Physical Therapy (PT) were obtained and reviewed for this advisory," thus indicating that the medical advisor had consulted with multiple specialists on Ms. Doe's case.  This was false.  When it was pointed out that no such "specialty consultations" had been produced as required by Board procedure (AFI 36-2603 ¶ 4.3 (18 Sept. 2017)), the medical advisor admitted that all he had done was review medical records.  He had consulted with no one.

80.     The 1st medical advisory admitted that fibromyalgia and migraine headaches were both physical disabilities subject to IDES review, were both potentially unfitting conditions and that neither had been presented, as they should have been, to the DAWG in 2015 for evaluation as to the necessity for an MEB.  The medical advisor nevertheless concluded that this was not an error because neither condition would have been determined to be unfitting in Ms. Doe's case.  In reaching this conclusion, the 1st medical advisory erroneously applied the DoD standard for fitness in effect in 2020, *i.e.*, DoDI 6130.03, Vol. 2 (Sep. 2, 2020).  The 1st medical advisory ignored the fitness standards that would have applied to Ms. Doe in 2015, *i.e.*, DoDI 1332.18, Encl. 3, App. 2 (Aug. 5, 2014) and AFI 48-123, ¶ 5.3.1.1 (Oct. 23, 2014).

81.     In concluding that Ms. Doe's fibromyalgia would not have been unfitting had it been evaluated by an MEB in 2015, the 1st medical advisory completely ignored the December 2015 diagnoses of the civilian rheumatologist, Dr. Villafradez-Diaz, who based her diagnosis upon Ms. Doe's symptoms of fatigue and diffuse pain during the past five (5) years which had worsened during the past (3) years.  Ignoring the opinion of the treating physician with the most knowledge of Ms. Doe's condition was improper.  *Fuentes v. United States*, 157 Fed. Cl. 433, 457-59 (2021).

Further, the 1st medical advisory ignored Ms. Doe's declaration that described how fibromyalgia had impaired her performance of military duties as well as the fact that fibromyalgia had been noted by Dr. Elizabeth Greene as one of Ms. Doe's significant psychosocial stressors. The 1st medical advisory also misread the medical records by asserting that Ms. Doe was not taking medication prescribed for fibromyalgia when the records plainly stated otherwise.

82.    The 1st medical advisory failed to explain why Ms. Doe's fibromyalgia would have not been found unfitting had an MEB reviewed that condition in 2015 when the VA reviewed that same condition three months after discharge on May 17, 2016, and rated it as 40% disabling, the highest schedular rating for that condition from January 15, 2016, and ultimately found the condition to be "static and not subject to future review examination." The 1st medical advisory did not dispute the VA's diagnosis of fibromyalgia, its determination of service-connection, its rating of 40% disabling or its determination that the condition is static.

83.    In concluding that Ms. Doe's migraine headaches would not have been found unfitting by an MEB had that condition been reviewed in 2015, the 1st medical advisory cherry picked medical record entries and misread other medical record entries as to when the migraines occurred, how significant they were and how they were treated.

84.    The 1st medical advisory failed to explain why Ms. Doe's migraine headaches would not have been found unfitting had an MEB reviewed that condition in 2015 when the VA reviewed the same condition on March 29, 2017, and gave it a 50% disability rating effective April 8, 2016, and ultimately found the condition to be a "Static Disability." The 1st medical advisory did not dispute the VA's diagnosis of migraine headaches, its determination of service connection, its rating of 50% disabling or its determination that the condition is static.

85.     The 1st medical advisory failed to address the point that, even if fibromyalgia and migraine headaches were not unfitting by themselves (they were), their combined effect, along with the effect of Ms. Doe's other conditions, would have rendered Ms. Doe unfit. "A Service member may be determined unfit as a result of the combined effect of two or more impairments even though each of them, standing alone, would not cause the Service member to be referred into the DES or be found unfit because of disability." DoDI 1332.18, App. 2 to Encl. 3 ¶ 4(d) (Aug. 5, 2014). *See also Fuentes* 157 Fed. Cl. at 451; *Hatmaker v. United States*, 117 Fed. Cl. 560, 567 (2014); *Rieth v. United States*, 199 Ct. Cl. 200, 207-08 (1972). Indeed, the Air Force is required by statute to consider "all medical conditions, ***whether individually or collectively***, that render the member unfit." 10 U.S.C. § 1216a(b) (emphasis added).

### 2.     The 2d medical advisory

86.     The 2d medical advisory admitted that the medical advisor had consulted with no specialists on Ms. Doe's case, even though the 1st medical advisory represented that he had.

87.     The 2d medical advisory continued erroneously to apply the wrong standard for military fitness, i.e., DoDI 6130.03, Vol. 2 (Sep. 2, 2020).

88.     The 2d medical advisory dismissed Ms. Doe's declarations in which she described her struggles with fibromyalgia and migraines during her Air Force service on the ground that this evidence was not in the contemporaneous medical records that the medical advisor reviewed. However, where, as here, the contemporaneous medical record is sparse due to the Air Force's own error in not referring the disabling conditions to IDES, the Air Force cannot take advantage of its own mistake after the fact to argue that the record is sparse. *Hassay*, 150 Fed. Cl. at 482. Instead, the Air Force must put the Airman in the same position she would have been had the error not occurred. *Keltner*, 165 Fed. Cl. at 503. The symptoms stated in Ms. Doe's declarations were not all in the contemporaneous record because she was deprived of her right to present that

information to an MEB and PEB. The 2d medical advisory's reasoning in disregarding Ms. Doe's declarations is contrary to the requirement that the Board consider the entire record and that the Board must put the petitioner in the same position she would have been in had there been no error.

89.     The 2d medical advisory speculated that Ms. Doe's headaches were not really migraines and that Ms. Doe might not have taken the prescribed medications. But the medical advisor did not examine Ms. Doe and was not personally involved in her treatment, and the 2d medical advisory stated no basis for disputing the Air Force and VA diagnoses of this condition.

### 3.     The 3d medical advisory

90.     The 3d medical advisory admitted that the standard of fitness that the medical advisor had applied in both the 1st and 2d medical advisories was the wrong one. However, instead of applying the correct standard, the 3d medical advisory created one out of whole cloth. According to the 3d medical advisory, military unfitness means total inability to perform military duties. This is not the standard now nor was it the standard in 2015 when Ms. Doe was discharged. The standard applicable to Ms. Doe's case is the one in effect when she was discharged, namely, that the Airman cannot "reasonably perform" or "reasonably fulfill" her duties. DoDI 1332.18, Encl. 3, App. 2 (Aug. 5, 2014); AFI 48-123, ¶ 5.3.1.1 (Oct. 23, 2014). The 3d medical advisory ignored these standards. Total incapacity is not the test. If it were, disability retirement would never be awarded to anyone with less than a 100% disability rating which would be contrary to law. 10 U.S.C. § 1201.

91.     Confirming that the medical advisor had lost any semblance of objectivity, the 3d medical advisory continued the medical advisor's cherry-picking of records to support his conclusions. For example, the 3d medical advisory asserted that Ms. Doe's ability to engage in physical exercise was proof that her fibromyalgia was not unfitting without acknowledging the fact that exercise was one of the treatments prescribed for fibromyalgia and that the exercise was

in fact painful and difficult. Similarly, the medical advisor eschewed the relevance of VA records and diagnoses but turned around and used those very materials when it suited his purpose. Such cherry-picking is, by definition, a failure to consider the entire record. *See Valles-Prieto*, 159 Fed. Cl. at 618.

92.     The medical advisor's multiple failures to consider relevant evidence, multiple false statements of fact and other flaws and errors in the three medical advisories as outlined in paragraphs 79-91 above were all presented in Ms. Doe's comments to the Board. The medical advisor failed to rebut any of these points.

**C.    The Board's Decision**

93.     On December 8, 2023, more than 2 ½ years after Ms. Doe filed her case, the Board gave notice of its decision. The Board's ten-page single spaced decision was devoted almost entirely to restating what Ms. Doe had argued and what the psychological advisory and the medical advisories had asserted. The Board's analysis was less than a page long and was nothing but a high-altitude collection of conclusory, unexplained statements. It was the same cryptic, conclusory, analysis-less format that this and other Courts have found to be facially arbitrary and capricious. *E.g.*, *LaBonte*, 2023 WL 3197825 at *9; *Henrikson v. United States*, 162 Fed. Cl. 594, 607-09 (2022); *Blanco v. Wormuth*, 2023 WL 6809940, *5 (D.D.C. Oct. 16, 2023).

94.     The Board ruled that the narrative reason for Ms. Doe's discharge should be changed from "personality disorder" to "Condition Not a Disability." But the Board did not explain why the more neutral term "Secretarial Authority," which is what Ms. Doe had sought in the event that the disability retirement/separation claims was disallowed, was inapplicable. Nor did the Board explain why "Secretarial Authority" was not applicable here when the Board had ordered that narrative statement to be used in virtually identical cases. *See, e.g.*, AFBCMR Dec. No. BC-2015-00187 (Dec. 9, 2015); AFBCMR Dec. No. BC-2001-00110 (Oct. 31, 2001). The

Board stated that each case "is considered on its own merits" and the Board "is not bound to recommend relief in one circumstance simply because the situation being reviewed appears similar to another case." This, however, ignores the legal requirement that "'[g]overnment is at its most arbitrary when it treats similarly situated people differently,'" and the Board "may not simply ignore [its own cases] for the sake of expediency." *Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 162 (D.D.C. 2011).

95. Although the Board adopted the anonymous psychological advisor's recommendation that "Condition Not a Disability" be used as the narrative reason, the Board did not state any rational connection between the use of "Condition Not a Disability" as a narrative reason and any purported "safety" issue.

96. The Board denied Ms. Doe's claims for disability retirement and, in the alternative, for disability separation. The Board's decision on this point – *in its entirety* – was as follows:

> [F]or the remainder of the applicant's request, the evidence presented did not demonstrate an error or injustice, and the Board therefore finds no basis to recommend granting that portion of the applicant's request.
>
> The Board considered liberal consideration standards required by guidance from the Office of the Under Secretary of Defense for Personnel and Readiness based on her PTSD diagnosed by the DVA and finds the applicant's medical condition is not warranted to process through DES as a matter of equity or good conscience IAW DoDI 1332.18, Disability Evaluation System, Appendix 1 to Enclosure 3, paragraph 4. Specifically, the applicant's PTSD diagnosis predated her physical assault in 2013 and there was no evidence her prior service condition was aggravated by her military service, nor was it a medical basis for career termination. Additionally, the Board does not find evidence that her other DVA service connected disabilities, to include FM and migraines, were unfitting for continued military service.

97. The Board's cryptic decision appeared to do nothing more than rubber-stamp the erroneous conclusions of the psychological advisory and the medical advisories. While the decision contained the usual boilerplate statement that the Board had reviewed all of the submissions, the Board addressed none of Ms. Doe's arguments and none of the evidence that she

had submitted. The Board likewise failed to address any of the numerous legal errors, false statements of fact, unsupported conclusions and other mistakes and flaws that Ms. Doe had pointed out in the psychological advisory and the three (3) medical advisories. While the Board gave lip-service to the Kurta Memorandum, its decision reflected no "liberal consideration" of Ms. Doe's case at all.

## CAUSES OF ACTION

### COUNT I:
### THE BOARD'S DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

98.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 97 above as if fully stated herein.

99.    The Court reviews an AFBCMR decision to determine if it is "'supported by substantial evidence on the record considered as a whole.'" *Valles-Prieto*, 159 Fed. Cl. at 617 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). For a Board decision to be supported by substantial evidence, "'all of the competent evidence must be considered . . . whether or not it supports the challenged conclusion.'" *Valles-Prieto*, 159 Fed. Cl. at 617 (quoting *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983)).

100.    The Board's decision does not permit meaningful judicial review because the Court cannot determine from the skeletal, conclusory nature of the Board's decision whether the Board actually did consider the entire record. Because the Board did not discuss the relevant evidence, "the Court cannot tell what the Board was thinking or which evidence it relied upon." *Henrikson*, 162 Fed. Cl. at 609.

101.    The Board's decision did not address, and therefore there is no basis for the Court to conclude that the Board actually considered, any of the evidence discussed in paragraphs 64-76 above with respect to the psychological advisory that Plaintiff presented to the Board.

102.    The Board's decision did not address, and therefore there is no basis for the Court to conclude that the Board actually considered, any of the evidence discussed in paragraphs 79-91 above with respect to the three (3) medical advisories that Plaintiff presented to the Board.

103.    Because, as outlined above, there is no basis for the Court to conclude that the Board considered the entire record in this case, the Board's decision is not based on substantial evidence, and its decision should be vacated and set aside.

## COUNT II:
## THE BOARD'S DECISION IS ARBITRARY AND CAPRICIOUS

104.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 103 above as if fully stated herein.

105.    Under the arbitrary and capricious standard of review, a Board decision will be set aside "[i]f the Board 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [Board], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Verbeck v. United States*, 97 Fed Cl. 443, 451 (2011) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). "[T]he court must ask 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* This standard of review "is not a rubber stamp." *Ford*, 170 Fed. Cl. at 462.

106.    The Board's decision does not permit meaningful judicial review because the Court cannot determine from the skeletal, conclusory nature of the Board's decision what factors or aspects of the problem before it the Board considered or did not consider. The Boards' decision fails to explain why the Board denied Ms. Doe's request for disability retirement and/or separation other than to state in conclusory terms that the Board does not agree with Ms. Doe.

107.    The Board's decision did not address, and therefore there is no basis for the Court to conclude that the Board actually considered, any of the legal arguments discussed in paragraphs 64-76 above with respect to the psychological advisory that Plaintiff presented to the Board.

108.    The Board's decision did not address, and therefore there is no basis for the Court to conclude that the Board actually considered, any of the legal arguments discussed in paragraphs 79-91 above with respect to the three (3) medical advisories that Plaintiff presented to the Board.

109.    The Board's decision did not address Plaintiff's argument that, even if she had been diagnosed with a mental health condition that is unsuitable for military service (personality disorder), Plaintiff had other potentially unfitting disabilities that were subject to evaluation by IDES (PTSD, fibromyalgia and migraines) and, accordingly, her case should have been subject to dual action by the Air Force, and the failure to do so was a material and prejudicial error.  Because the Board did not address this argument, there is no basis for the Court to conclude that the Board considered this argument.

110.    The Board's decision did not address Plaintiff's argument that, in 2015 at the time of Plaintiff's discharge proceeding, referral to IDES was mandatory if there was merely a question about whether the Airman's mental or physical health rendered her unfit for military service, and that pursuant to such standard, Ms. Doe's record at the time clearly raised a question whether she was unfit thereby mandating IDES referral.  Because the Board did not address this argument, there is no basis for the Court to conclude that the Board considered this argument.

111.    The Board's decision did not address Plaintiff's argument that the medical advisory in this case admitted that fibromyalgia and migraine headaches are both potentially unfitting conditions that were referable to IDES but that neither was in fact referred to IDES as was required by the Air Force standards in effect in 2015 at the time of Ms. Doe's discharge proceeding, thereby

admitting that the Air Force made a material error at the time of Ms. Doe's discharge. Because the Board did not address this argument, there is no basis for the Court to conclude that the Board considered this argument.

112.    The Board's decision did not address the points that Plaintiff would not have been found by a PEB at the time of discharge to be fit to perform her military duties given the undisputed facts that (i) her mental health and/or physical conditions had led to two (2) complete reassignments of duties (from Honor Guard to personnel in 2011 and from family health clinic technician to optometry receptionist in 2015); and (ii) her commanding officer and command directed evaluators both made a formal findings of fact that Plaintiff's functioning in the military environment was "significantly impaired" by her mental health condition. Because the Board did not address these arguments, there is no basis for the Court to conclude that the Board considered these arguments.

113.    The Board's decision did not address the multiple determinations of the VA finding that Ms. Doe's service-connected mental health and physical disabilities give her a combined disability rating of 100% as of January 15, 2016, with respect to the same conditions that would have rendered her unfit to perform her military duties and qualified her for disability retirement and/or disability separation and that such ratings, particularly those close in time of the discharge, have been used by the Board itself to find military unfitness. *See Keltner*, 165 Fed. Cl. at 506; *Valles-Prieto*, 159 Fed. Cl. at 618. Because the Board did not address this argument, there is no basis for the Court to conclude that the Board considered this argument.

114.    The Board's decision did not address the diagnoses of Plaintiff's VA mental health providers who found that she experienced PTSD in service as a free-standing injury stemming from the 2013 physical assault or as an aggravation of the pre-existing PTSD suffered as a result

of the Thailand rape and that such PTSD had not been resolved by the time of Ms. Doe's discharge. Because the Board did not address this argument, there is no basis for the Court to conclude that the Board considered this argument.

115.    The Board's decision did not address the VA's determination that Plaintiff was a victim of MST and therefore entitled to the procedures and requirements applicable to a case involving MST.  Because the Board did not address this argument, there is no basis for the Court to conclude that the Board considered this argument.

116.    The Board's decision did not address the legal requirement, per the Kurta Memorandum, that VA diagnoses of service-connected PTSD are "persuasive evidence" that the Service Member's PTSD occurred during service nor did the Board point to any evidence in the record that would overcome the "persuasive evidence" that Plaintiff presented in the form of the VA diagnoses of, and rating decisions concerning, PTSD.  Because the Board did not address this argument, there is no basis for the Court to conclude that the Board considered this argument.

117.    The Board's decision did not address the legal requirement, per the Kurta Memorandum, that the Airman's own testimony can establish the fact that the Airman suffered PTSD in service, nor did the Board make any reference to Ms. Doe's declarations in which she described her mental health challenges in detail. *See Valles-Prieto*, 159 Fed. Cl. at 617.  Because the Board did not address this argument, there is no basis for the Court to conclude that the Board considered this argument.

118.    The Board did not address the point that even if a given mental health or physical disability, standing alone, is not sufficient to render the Airman unfit to perform military duties, such disabilities, when considered in their combined effect, can render the Airman unfit.  Because

the Board did not address this argument, there is no basis for the Court to conclude that the Board considered this argument.

119.   The Board's decision did not address the point that even if Plaintiff had been properly subject to administrative discharge for a condition that made her unsuitable for military service, she was entitled to be counseled and given an opportunity to overcome the deficiencies, and no such opportunity was afforded to Plaintiff before she was discharged.  Because the Board did not address this argument, there is no basis for the Court to conclude that the Board considered this argument.

120.   The Board's decision did not address the legal requirement, per the Wilkie Memorandum, that a Service Member's case be assessed under current standards to determine if the outcome would have been different.  In this regard, the Board's decision did not address the arguments that under current standards, (a) an Airman who is pending administrative discharge who has any PTSD diagnosis in her service record automatically is entitled to be referred to IDES for disability determination, AFI 36-3212 ¶ 1.7.1.3.1 (July 15, 2019); and (b) an Airman who discloses that they are "the victim of … an intimate partner violence-related offense … during service" cannot be discharged on the basis of a non-disability medical condition unless the diagnosis is "endorsed by the Surgeon General of the Military Department concerned."  DoDI 1332.14 at 12 (June 6, 2020).  Both of these material changes in procedure likely would have altered the course of Ms. Doe's case.  Because the Board did not address these arguments, there is no basis for the Court to conclude that the Board considered these arguments.

121.   The Board's decision did not explain why "Condition Not a Disability" was the appropriate narrative reason for Ms. Doe's discharge, when the Board routinely uses "Secretarial Authority" instead to replace narrative statements of "personality disorder."

122.    The Board's decision did not address the argument that the psychological advisor's recommendation of "Condition Not a Disability" as the narrative reason for separation based upon "safety" considerations was directly refuted by Dr. Elizabeth Greene who was in a superior position to assess the Plaintiff's suicide risk, nor did the Board's decision address the point that putting "Condition Not a Disability" on a DD-214 has nothing to do with the Service Members' "safety." Because the Board did not address these arguments, there is no basis for the Court to conclude that the Board considered these arguments.

123.    Because, as outlined above, the Board's decision did not address numerous material and meritorious points advanced by Ms. Doe in the Board proceedings, the Board's decision should be vacated and set aside.

**COUNT III:**
**THE BOARD'S DECISION IS CONTRARY TO LAW**

124.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 123 above as if fully stated herein.

125.    A Board decision will be set aside by the Court if is contrary to law. *Valles-Prieto*, 159 Fed. Cl. at 616. A military correction board must abide, not only by Acts of Congress, but by the military's own regulations and procedures. *Verbeck*, 97 Fed. Cl. at 451.

126.    The Board's decision is contrary to law because its disregard of diagnoses, rating decisions and other evidence generated by the VA in Ms. Doe's case is contrary to the requirement of 10 U.S.C. § 1552(h)(1) & (h)(2)(A)-(B) that the Board shall consider such evidence in cases involving PTSD and MST.

127.    The Board's decision is contrary to law because its disregard of diagnoses, rating decisions and other evidence generated by the VA in Ms. Doe's case is contrary to the requirement

of 10 U.S.C. § 1552(h)(1) & (h)(2)(A)-(B) that the Board shall review a case involving PTSD and MST with liberal consideration.

128.    The Board's decision is contrary to law because its reliance upon a psychological advisory that did not disclose the name or credentials of the author does not comply with the requirement of 10 U.S.C. § 1552(g)(1) that, in case involving a mental health disorder, the advisory must be from "a clinical psychologist or psychiatrist."

129.    The Board's decision is contrary to law because its reliance upon a psychological advisory that did not disclose the name or credentials of the author does not comply with the requirement of 10 U.S.C. § 1552(g)(2) that, in case involving PTSD that is related to MST, the advisory shall be "from a psychiatrist, psychologist, or social worker with training on mental health issues associated with post-traumatic stress disorder."

130.    The Board's decision is contrary to law because its reliance upon a psychological advisory that did not disclose the name or credentials of the author does not comply with the requirement of 10 U.S.C. § 1552(g)(3) that, in a case involving PTSD that is related to MST "in which sexual trauma [or] intimate partner violence . . . is claimed" the advisory shall be "from an expert in trauma specific to sexual assault [or] intimate partner violence . . . ."

131.    The Board's implicit decision that Ms. Doe was not a victim of MST is contrary to law because it is incompatible with the definition of MST in 38 U.S.C. § 1166(d)(2).

132.    The Board's decision is contrary to law because its failure to consider the combined effect of Ms. Doe's mental health and physical disabilities on her military fitness is contrary to the requirement of 10 U.S.C. § 1216a(b) that the Air Force consider "all medical conditions, whether individually or collectively, that render the member unfit."

133.    The Board's decision is contrary to law because an Airman with a potentially unsuitable condition (personality disorder) that is comorbid with one or more potentially unfitting conditions (PTSD, fibromyalgia, migraines) cannot lawfully be discharged without the case receiving dual action by the Air Force in accordance with AFI 36-3212 at 79 (Nov. 27, 2009) and AFI 36-3208 ¶ 6.30 (July 2, 2013).

134.    The Board's decision is contrary to law because its failure to consider anything but Ms. Doe's service records and the highly flawed psychological and medical advisories is contrary to the requirement in the Hagel Memorandum that, in cases involving PTSD, the Board shall consider all of the evidence presented by petitioner.

135.    The Board's decision is contrary to law because its failure to consider the Plaintiffs' VA diagnoses and the VA disability determinations and ratings with respect to PTSD is contrary to the requirement of the Kurta Memorandum that, in cases involving PTSD, the VA's determination that the Airman's PTSD was service-connected is "persuasive evidence" that the condition occurred during military service.

136.    The Board's decision is contrary to law because its failure to consider the diagnoses of VA Drs. Chowdhury, Paxton and Greene that Ms. Doe's PTSD occurred during her Air Force service is contrary to the requirement of the Kurta Memorandum that, in cases involving PTSD, the diagnosis of a licensed psychiatrist or psychologist that PTSD occurred during military service will receive liberal consideration.

137.    The Board's decision is contrary to law because its failure to consider Ms. Doe's declarations is contrary to the requirement of the Kurta Memorandum that the Service Member's testimony alone can establish the existence of PTSD during military service.

- 50 -

138.    The Board's decision is contrary to law because its apparent determination that Ms. Doe's mental health condition at discharge was solely defined by personality disorder as opposed to, or in comorbidity with, PTSD is contrary to the requirement of the Kurta Memorandum that evidence supporting more than one diagnosis should be liberally construed to "mitigate the discharge," which, in this case means that Ms. Doe be deemed eligible for disability retirement and/or separation.

139.    The Board's decision is contrary to law because its failure to consider the effect on Ms. Doe's case of material changes in discharge procedure is contrary to the requirement of the Wilkie Memorandum that changes in procedure that can be expected to produce a more favorable outcome for the Service Member may be grounds for relief.

140.    The Board's decision is contrary to law because its failure to consider the relevance of the ratings the decisions that the VA issued to Ms. Doe is contrary to the Board's own decisions in which it has relied upon VA ratings decisions to determine military fitness and therefore is contrary to the legal requirement that the Board treat similarly situated petitioners equally.

141.    The Board's decision is contrary to law because its determination that Ms. Doe's narrative reason for discharge should be changed to "Condition Not a Disability" rather than "Secretarial Authority" is contrary to the Board's own decisions in which it has replaced "personality disorder" with "Secretarial Authority" as the narrative statement and therefore is contrary to the legal requirement that the Board treat similarly situated petitioners equally.

142.    Because, as outlined above, the Board's decision is contrary to law in numerous respects, the Board's decision should be vacated and set aside.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff respectfully requests that this Court enter judgment against the United States and award the following relief:

a.     Award pay and benefits to Ms. Doe under 10 U.S.C. § 1201 in an amount to be determined at trial.

b.     In the alternative, award pay and benefits to Ms. Doe under 10 U.S.C. § 1203 in an amount to be determined at trial.

c.     Order the Air Force to correct Ms. Doe's military records to reflect that she was discharged by disability retirement on January 14, 2016.

d.     In the alternative, order the Air Force to correct Ms. Doe's military records to reflect that she was discharged by separation with disability pay on January 14, 2016.

e.     In the alternative, order the Air Force to correct Ms. Doe's military records to contain "Secretarial Authority" as the narrative reason for separation.

f.     Award Ms. Doe, interest, costs, and attorney's fees.

g.     Grant such other relief as the Court deems just and proper.

Dated:  August 29, 2024

Respectfully submitted,

John M. Simpson
jmsimpson@duanemorris.com
Rebecca S. Bjork
rsbjork@duanemorris.com
Heidi S. E. Lunasin
helunasin@duanemorris.com
DUANE MORRIS LLP
901 New York Avenue NW, Suite 700 East
Washington, D.C. 20001-4795
Telephone: +1 202 776 7800
Fax: +1 202 776 7801

Counsel for Plaintiff